**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DONALD R. PEVIA,                          *

Plaintiff                                 *

v.                                        *          Civil Action No. ELH-16-1950

WEXFORD HEALTH SOURCE, INC., *et al.*,    *

Defendants                                *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DONALD R. PEVIA,                          *

Plaintiff                                 *

v                                         *          Civil Action No. ELH-17-631

COMMISSIONER OF CORRECTIONS, *et al.*, *

Defendants                                *
* * * * * * * * * * *

## MEMORANDUM OPINION

This Memorandum Opinion resolves dispositive motions in two related civil rights cases filed by Donald Pevia, the self-represented plaintiff. At the relevant time, he was incarcerated by the State of Maryland at North Branch Correctional Institution ("NBCI"). He advised the Court that on November 3, 2017, he was transferred to "WCI." *See* ECF 12, Case ELH-17-631; ECF 31, Case ELH-16-1950.

In Case ELH-16-1950 ("Pevia I"), Pevia filed suit against Wexford Health Sources, Inc. ("Wexford"), as well as Robustianno Barrera, M.D. and Mahboob Ashraf, M.D. (collectively, the "Medical Defendants"). In case ELH-17-631 ("Pevia II"), plaintiff filed suit against Commissioner of Correction Dayena Corcoran, Assistant Warden Jeffrey Nines, and Sharon Baucom, M.D. (collectively, the "Correctional Defendants"). In both cases, plaintiff, who was

born in 1981, claims that he was denied adequate medical care for treatment in regard to his chronic Hepatitis C virus ("HCV") infection, because of the delay in providing him with the prescription of Harvoni. Therefore, I shall consolidate the cases for review of dispositive motions.

In Pevia I, the Medical Defendants have moved to dismiss or, in the alternative, for summary judgment. ECF 18.[1] The motion is supported by a memorandum of law (ECF 18-3) (collectively, "Medical Motion") and exhibits. Plaintiff opposes the Medical Motion. *Id.*, ECF 23 & 24. The Medical Defendants have replied (*id.*, ECF 27) and plaintiff has filed a surreply (ECF 28), which the Medical Defendants have moved to strike. *Id.*, ECF 29. Plaintiff opposes the motion to strike. ECF 30.

In Pevia II, the Correctional Defendants have moved to dismiss or, in the alternative, for summary judgment. ECF 10. It is supported by a memorandum of law (ECF 10-1) (collectively, "Correctional Motion") and exhibits. Plaintiff opposes the Correctional Motion. *Id.*, ECF 11.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, defendants' motions, construed as motions for summary judgment, shall be granted.

## I. Factual Background

### A. Pevia I

In Pevia I, the court previously summarized plaintiff's complaint, as follows, ECF 12 at 1-2:

> Plaintiff, a State inmate incarcerated at the North Branch Correctional Institution ("NBCI"), filed a civil rights complaint against Wexford Health Source[s], Inc., Dr. Ashraft [sic], and Dr. Barrea, alleging that defendants denied him constitutionally adequate medical care when they failed to prescribe Harvoni

_____

[1] Citations are to the court's electronic docket.

to treat plaintiff's chronic Hepatitis C infection ("HCV"). ECF 1 at 1-3. Plaintiff's complaint, dated May 30, 2016, seeks damages as well as injunctive relief. ECF 1 at 3. Accompanying his complaint is his motion for emergency injunctive relief. ECF 2. [2]

Plaintiff indicates that in 2012, he began treatment for HCV with Interpheron but did not tolerate the side effects of the treatment well and discontinued same. *Id*. at 5. He states that he was advised by the chronic case nurse "Becca" that when he was ready to complete the treatment he could request to resume same. ECF 1 at 1-3.

In 2015, plaintiff learned that Interpheron therapy had been discontinued as the treatment for HCV and that a new treatment, Harvoni, was available. *Id*. He was advised that Harvoni only required 6-8 weeks of treatment and had fewer side effects. *Id*. Plaintiff requested to be provided Harvoni to treat his HCV. *Id*.

Several months passed with no treatment. *Id*. at 5-6. Plaintiff states that during this time he began to experience symptoms of his HCV infection, including soreness on his right side, yellowing of the eyes, and loss of energy. *Id*. at 6. He wrote several sick calls slips requesting to be seen by medical staff but they were not addressed. *Id*.

On May 9, 2016, plaintiff submitted an administrative remedy ("ARP") regarding the lack of treatment for his HCV. *Id*. Plaintiff was advised that the prison was treating patients in order of those with the "highest level" beginning with level 4; once all those at level 4 were treated the next highest level would be treated. *Id*. Plaintiff expressed his concern that if medical staff waited to treat him, by the time he would receive treatment he would be one of the highest levels and would suffer greater damage to his liver. *Id*. at 6-7.

## B.    Pevia II

Plaintiff reiterates his claims that the defendants have been deliberately indifferent to his serious medical needs. Pevia II, ECF 1 at 5. He states that in 2013[3] he underwent a liver biopsy due to suffering from HCV. *Id*. at 3. After the biopsy he began treatment with Interpheron, but

---

[2] Plaintiff's requests for injunctive relief were denied. Pevia I, ECF 12; ECF 13.

[3] In Pevia I, plaintiff indicates he underwent a liver biopsy in 2012. In Pevia II, he claims that he underwent the biopsy in 2013. The discrepancy is not material to the resolution of his claim.

he needed to discontinue the medication due to side effects. In February of 2016,[4] plaintiff learned of new medications provided by Wexford to those suffering from HCV. Plaintiff inquired about receiving the new medication, Harvoni, but was advised that it could be two years before he would be treated, as those with more severe symptoms needed to be treated first and that approach was cost effective. *Id*. Additionally, plaintiff indicates that he exhausted his administrative remedies regarding the denial of treatment with Harvoni. *Id*. at 4.

## C. Department of Public Safety and Correctional Services Protocol For Treatment of HCV

### 1. Development of Protocol

Defendants explain the development and clinical application of the protocol for HCV infection control in several detailed declarations provided by Dr. Sharon Baucom, the Executive Director of Clinical Services for the Maryland Department of Public Safety and Correctional Services ("DPSCS"), and Dr. Robustiano Barrera, M.D., a licensed physician who is employed by Wexford to provide services to inmates of DPSCS. *See* Pevia I, ECF 18-5 (Declaration of Baucom, 1/26/15)[5]; Pevia II, ECF 10-2 (Declaration of Baucom, 7/25/17); ECF 10-3 (Declaration of Baucom, 7/25/17); Pevia I, ECF 18-6 (Declaration of Barrera, 4/18/17).

Since 2005, physicians and other personnel contracted by DPSCS have treated inmates with HCV using protocols approved by the University of Maryland Institute of Human Virology Specialist in Infectious Disease, as well as specialists from Johns Hopkins University. Pevia II, ECF 10-2, ¶ 15. According to Dr. Baucom, Maryland leads most state correctional systems in

---

[4] In Pevia I, plaintiff indicates he learned of Harvoni in 2015, while in Pevia II he states he learned of Harvoni in 2016. The discrepancy is not material to the resolution of plaintiff's claim.

[5] ECF 18-5 was previously submitted in the case of *French v. Corizon, Inc*., Civil Action No. JFM-14-2263 (D. Md.).

the number of inmates who have been successfully treated for HCV using antiviral medication. *Id*.

The grades of HCV are described in relation to necrosis/inflammation of the liver, as follows: 1, minimal; 2, mild; 3, moderate; and 4, severe. *Id*. The levels of "staging" are described in regard to scarring of the liver, as follows: 1- no scarring; 2- mild scarring; 3-moderate scarring; and 4- severe scarring "cirrhosis." Pevia I, ECF 18-6 ¶ 11; Pevia II, ECF 10-3, ¶ 8.

In 2007, DPSCS hired a University of Maryland Medical System ("UMMS") infectious disease specialist to develop guidelines for the care of HCV and HIV positive inmates. Pevia II, ECF 10-2, ¶ 17. The same specialist was contracted by Wexford in 2011 to continue to provide guidance and input regarding HCV as well as other infectious diseases. *Id*. The DPSCS guidelines for HCV are formulated by the specialist, with medication reviews and contract negotiations by a clinical pharmacologist who holds a doctorate in Pharmacology and is employed by Correct RX, the pharmacy vendor. *Id*. Together they review the recommendations made with the DPSCS Medical Director, the Infection Control Director of Wexford, and the infection control nursing staff, who facilitate the adoption of the policy changes as part of DPSCS's policy and procedures. *Id*. Baucom participates in the Pharmacy and Therapuetic Committee that reviews the recommendations for new HCV medication and the indicators for their application in the system. *Id*.

In January 2011, DPSCS issued an update to the policy regarding HCV infection control. Pevia I, ECF 18-4 (DPSCS Clinical Services "Infection Control Manual," Chapter 2, "Medical Management Of Hepatitis"); *id*., ECF 18-5, ¶ 4; Pevia II, ECF 10-2, ¶ 4. The policy provides that once an inmate tests positive for HCV, the inmate is to be enrolled in a Chronic Care Clinic

("CCC") for education, medical evaluation, and treatment. Pevia I, ECF 18-4, at 1, ¶ I; *Id*., ECF 18-6, ¶ 5; Pevia II, ECF 10-2,¶ 4; *Id*., ECF 10-3, ¶ 4. The policy also provides that the inmate is to receive Hepatitis A and B vaccines and counselling on the nature, potential effects, and management of HCV. Pevia I, ECF 18-4, at 2, ¶¶ D & E; *id*., ECF 18-6, ¶ 5; Pevia II, ECF 10-3, ¶ 4.

Antiviral drug therapy treatments for HCV are evaluated and considered by a DPSCS HCV Panel (the "Panel"). Pevia II, ECF 10-2, ¶ 5. The Panel is composed of the Wexford Regional Medical Directors, site specific providers/inspection control nurse support staff, statewide medical and mental health providers for Wexford, employees of MHM (the contractor of mental health services), the statewide clinical pharmacologist from Correct RX, the statewide epidemiologist for Wexford. and the Wexford statewide infectious disease specialist. Pevia I, ECF 18-5, ¶ 5; *Id., ECF 18-6, ¶ 7; Pevia II, ECF 10-2, ¶ 5. Non-medical correctional personnel, including the Secretary of DPSCS and the wardens of individual institutions, do not play an active role in the decisions of the Panel. Pevia II, ECF 10-2, ¶ 14.

The Panel is chaired by Wexford's infectious disease specialist. Pevia II, ECF 10-2, ¶ 6. It is facilitated by Wexford's statewide epidemiologist and Wexford's statewide medical director. *Id*. Baucom does not participate directly in panel activities. Pevia II, ECF 10-2, ¶ 5. DPSCS's representation on the Panel is limited to a registered nurse whose presence is designed to insure adherence to mandated testing, laboratory work, vaccinations, etc., which by policy are required to be completed before an inmate may be reviewed by the Panel for treatment. *Id*. ¶ 6. The infectious disease specialist and the HCV Panel participants determine whether to treat HCV infected inmates, including whether to biopsy the inmate's liver, without Dr. Baucom's influence. *Id.*, ¶ 16. However, Dr. Baucom provides insight into the policy and procedures that

govern the process.  *Id.*  She reviews any audits completed by the  DPSCS nurses who sit on the Panel.  *Id*.

Further, Dr. Baucom avers that her influence, as it relates to policy, cost, and other system approaches, has permitted the contracting staff to be more aggressive in offering new drug therapies, as the cost for the HCV medication is carried on the DPSCS pharmacy budget, not the medical contractor's costs.  *Id*.  She also asserts that the DPSCS treats inmates with newer HCV drugs more than other comparable correctional state systems.  *Id*.

The DPSCS Pharmacy and Therapeutic Committee is chaired by Correct RX's statewide clinical pharmacist and co-chaired by DPSCS Executive Director of Clinical Services.  Pevia II, ECF 10-2, ¶ 7. Committee members include the regional medical directors for Wexford, the Wexford statewide medical director, the MHM statewide psychiatrist, regional clinical pharmacists from Correct RX, and statewide nursing directors for DPSCS and Wexford.  *Id*.  The committee develops and approves additions or deletions from the formulary, which includes medication to treat HCV.  *Id.*

The DPSCS Pharmacy and Therapeutic Committee evaluates different medications and treatments for infectious diseases, including HCV, for use within DPSCS.  Pevia, II, ECF 10-2, ¶¶ 7, 8, 14.  To that end, the pharmacy vendor has met with companies producing newer HCV medications to determine additional clinical treatment option combinations and in order to solicit discount pricing.  Pevia II, ECF 10-2, ¶ 13.  Notably, "on a case-by-case basis," there are "exceptions to the recommendations" for treatment of inmates.  *Id.* ¶ 9.

Policies to be implemented by DPSCS for the treatment of infectious diseases, including HCV, are drafted by the contractors for Medical and Pharmacy, an infectious disease specialist consultant for Wexford, and the statewide clinical pharmacologist for Correct RX, for review by

the DPSCS Executive Director of Clinical Services. Pevia II, ECF 10-2, ¶ 8. Together they research the policies of other states, the Centers for Disease Control, the Federal Bureau of Prisons, and community standard references. *Id*. Rationales for their recommendations are provided. *Id*. Where a policy is drafted concerning the use of new drugs, as in the case of any other directive or policy, the proposal is circulated for comment among all other contractor representatives, and their input is solicited and evaluated before the final draft is adopted and made effective. *Id*.

Dr. Baucom avers that as a member of the Pharmacy and Therapeutic Committee she assists in making the final decision for approval or denial of new HCV medications or treatment. Pevia II, ECF 10-2, ¶ 10. These decisions are made by following the guidelines formulated in the policy created by the combined expert resources of the contractors who comprise the Panel. *Id*. However, Dr. Baucom retains "the authority to request second opinions or considerations from other sources if not included as sources of treatment protocols including the policy on HCV therapy provided by the Maryland Department of Health and Mental Hygiene, the Veterans Administration," or a state with similar "demographics regarding the correctional population." *Id*. ¶ 11.

Exceptions to the recommendations made in the policies regarding antiviral therapies may be warranted and may be presented to Dr. Baucom, on a "case-by-case basis," by the Wexford infectious disease specialist consultant and the Correct RX statewide clinical pharmacologist, on post-panel review, to alert Dr. Baucom to circumstances regarding a specific inmate's condition that may require an exception to the policy. Pevia II, ECF 10-2, ¶ 9. Although Dr. Baucom does not overrule the decision, she may provide additional input or request additional documentation from a risk management perspective. *Id*.

Further, Dr. Baucom advises that DPSCS has a census of over 2,000 known HCV infected inmates and treats more patients for HCV disease than a majority of states. Pevia II, ECF 10-2, ¶ 12. She indicates that, in addition to utilizing the expertise of those who originated the Maryland DPSCS HCV policy, the Panel has worked with other correctional systems to identify a policy that allows for a stratification of treatment options. *Id*. Baucom notes that the Federal Bureau of Prisons developed a protocol specifically for the new HCV regimens which prioritized for treatment the most severely impacted patients, based upon several diagnostic principles. *Id*. DPSCS apparently adopted a similar protocol and, once the most critical cases were addressed, DPSCS expanded the priority groups. *Id*. Baucom avers that the newer HCV medications are provided to the most severe cases and there are plans to expand the opportunity to inmates who are non-responders or relapsers with various levels of moderate fibrosis. *Id*., ¶ 14.

The medical experts aver that, given the potential side effects and expense of antiviral therapy, it is not appropriate to begin antiviral therapy for genotype 1 HCV based solely upon a positive test for HCV, when no clinical symptoms exist. Pevia I, ECF 18-6, ¶ 7; Pevia II, ECF 10-3, ¶ 6. An inmate with a HCV genotype I must have a liver biopsy in order to obtain antiviral treatment. Pevia I, ECF 18-6, ¶ 5. Drs. Barrera and Baucom aver that a person infected with HCV, particularly genotype 1, may not know he/she is infected or manifest adverse symptoms. Pevia I, ECF 18-6, ¶ 6; Pevia II, ECF 10-3, ¶ 5. Indeed, they claim that many individuals continue for years, if not indefinitely, without manifesting adverse symptoms. *Id*. Therefore, unless an inmate's HCV infection has progressed to a point where antiviral treatment is deemed medically necessary, the inmate is simply monitored in the CCC. *Id*. When the condition is in an acute stage the patient may report a spectrum of symptoms, including a general feeling of

lethargy, loss of appetite, nausea, vomiting, diarrhea, muscle aches, and abdominal discomfort. Pevia II, ECF 10-3, ¶ 5.

Inmates who are eligible for antiviral drug treatment may be asked to undergo laboratory blood tests, as well as a consultation with a gastrointestinal (GI) or infectious disease (ID) specialist, if a liver biopsy and antiviral therapy are under consideration. Pevia I, ECF 18-4 at 4, ¶ E.5 & F; ECF 18-6, ¶ 5; Pevia II, ECF 10-3, ¶ 4. However, inmates who test positive for HCV genotype 2 or 3, and inmates who are co-infected with HCV and the human immunodeficiency virus ("HIV"), are not required to undergo a liver biopsy before beginning antiviral treatment. Pevia I, ECF 18-4, ¶ F.3; *Id.* ECF 18-6, ¶ 5; Pevia II, ECF 10-3, ¶ 4. All other HCV positive inmates must have a liver biopsy prior to beginning antiviral treatment, unless the ID/GI specialist recommends an alternative assessment tool. Pevia I, ECF 18-4, ¶ F.3.c.; ECF 18-6, ¶ 5. The liver biopsy is used to determine the status of the inmate's HCV infection and the appropriate course of treatment. Pevia I, ECF 18-6, ¶ 6; Pevia II, ECF 10-3, ¶ 5. If a patient refuses a liver biopsy, antiviral therapy will not be pursued. Pevia I, ECF 18-4 at 6, ¶ G.3.d; *Id.*, Pevia II, ECF 10-3, ¶ 5.

The inmate's liver biopsy is reviewed by the Panel. Pevia II, ECF 10-3, ¶ 6. If the Panel determines the biopsy indicates the patient is at a stage of infection where antiviral therapy is warranted, the Panel must approve a specific antiviral therapy regimen and determine when it will be administered. Pevia I, ECF 18-6, ¶ 7. Antiviral therapy will be approved if the "panel determines: a) the biopsy indicates the patient is at a stage of infection warranting antiviral therapy; b) approves going forward with a specific antiviral therapy regimen; and c) establishes the prioritization of the therapy." Pevia II, ECF 10-3, ¶ 7.

According to Dr. Barrera, the use of antiviral medication to treat chronic HCV infection

has two goals. Pevia I, ECF 18-6, ¶ 8. The first goal "is to achieve sustained eradication of HCV, which is defined as the persistent absence of HCV RNA in serum six months or more after completing antiviral treatment. The second is to prevent progression to cirrhosis, hepatocellular carcinoma, and decompensated liver disease requiring liver transplantation." *Id.* The panel has evaluated and continues to evaluate different medications and treatments for HCV for use within the DPSCS system. *Id.*, ¶¶ 10-11.

Dr. Barrera indicates that Pegylated Interferon, as a modified form of alpha interferon, in which polyethylene glycol is added and which is taken weekly in a dosage based on body weight, and Ribavirin, which is an oral antiviral usually taken twice a day, and which is also dosed by body weight, were the primary HCV treatments approved for system-wide use by DPSC. Pevia I, ECF 18-6, ¶ 10. The efficacy of Pegylated Interferon and Ribavirin vary from patient to patient. *Id.*, ¶ 8. Dr. Baucom confirms that at the time relevant to plaintiff's Complaint, Pegylated Interferon/Ribavirin, which she describes as a widely used treatment for HCV, was the primary HCV approved drug regimen for use throughout DPSCS. Pevia II, ECF 10-2, ¶ 14.

Within DPSCS, Harvoni has been available for inmates since 2012, "but only on a <u>case by case</u> basis." Pevia II, ECF 10-3, ¶ 8; Pevia I, ECF 18-6, ¶ 11. At the relevant time, the approval of the non-formulary HCV medication was not through DPSCS, but rather through the Panel. Pevia II, ECF 10-2, ¶ 17.

Dr. Baucom explains that the new medications are formulary exceptions "approved by committee" and are only ordered by the HCV infectious disease specialist contracted by Wexford after the inmate undergoes "face to face" counseling with the clinical pharmacist for Correct RX. Pevia II, ECF 10-2, ¶13. She states, *id.*: "Once a final protocol decision is made

regarding the new HCV antiviral treatment medications, the Maryland State Legislature then must approve appropriate funding and resources to DPSCS so [that] the system-wide treatment can be implemented." *Id.* Notwithstanding the foregoing, the option to use a new medication is available to the Wexford infectious disease specialist who makes those determinations on "a case-by-case basis." Pevia II, ECF 10-2, ¶ 13.

Additionally, defendants explain that the Panel has worked to stratify the inmate HCV population and treatment options. *Id.*, ECF 18-4 at 11-12; *Id.*, ECF 18-5, ¶ 12; *Id.*, ECF 18-6, ¶ 11; Pevia II, ECF 10-3, ¶ 8. Baucom states that 25% of HCV infections clear over time and that various genotypes modify either the responses to the new drug or contraindicate its use. Pevia II, ECF 10-2, ¶ 14. Drs. Barrera and Baucom assert that in 2015, the Panel began treating inmates with more advanced grade and stage levels of HCV and then began working to treat less advanced grade and stage levels. Pevia I, ECF 18-6, ¶ 11; Pevia II, ECF 10-3, ¶ 8. Inmates presenting with the most severe stage of HCV, *i.e.*, stages 3 and 4, were prioritized for treatment. Pevia I, ECF 18-6, ¶ 11.

Dr. Baucom indicates that over 300 inmates are in categories outside of severe fibrosis and their cases are evaluated using the same priority rating and genotype considerations. Pevia II, ECF 10-2, ¶ 14. She explains that an inmate with the most severe fibrosis level will be prioritized for treatment and that this treatment model, like most health insurance companies, relies on a number of variables, including cost model analysis, as well as consideration of additional medications that may alter approaches to treatment. *Id.*

In February of 2016, DPSCS's antiviral policy was revised to include Harvoni as a treatment option. Pevia I, ECF 18-4 at 11, 16; ECF 18-6, ¶ 11; Pevia II, ECF 10-2, ¶¶ 13 & 14. Since the late spring of 2016, inmates presenting at stage 2 began to be considered for alternative

antiviral therapy regimens.  Pevia I, ECF 18-6, ¶ 11; Pevia II, ECF 10-3, ¶ 8.  Plaintiff filed Pevia I on June 8, 2016. ECF 1.

DPSCS policy provides:  "Patients who are currently in treatment with Peg-interferon and Ribavirin alone will complete their regimen.  Those patients who do not achieve a sustained virologic response (SVR) at 24 weeks post-treatment may qualify for retreatment with a more potent regimen."  Pevia II, ECF 10-3, ¶ 8; ECF 10-2 at 12, § E.

Wexford specialists, not DPSCS employees, are responsible for determining which patients who do not achieve an SVR may qualify for retreatment with a more potent regimen. Pevia II, ECF 10-3, ¶ 8.  Wexford employees identify inmates for therapy and track and monitor their conditions via the CCC, as directed by the guidelines adopted for HCV.  Pevia II, ECF 10-2, ¶ 18.  Medical contractors identify inmates with HCV, review the cases against the protocols/guidelines, and refer the cases to the Panel for treatment consideration.  *Id*., ¶ 19.  The infectious disease specialist, as a member of the Panel, may evaluate the inmate along with the referring provider who then has the responsibility for presenting the case to the Panel.  *Id*.  The final disposition regarding treatment, however, rests with the Panel alone.  *Id*.

Inmates who request to be treated with new HCV medications can be referred to the Wexford infectious disease consultant for education and for consideration of treatment prior to Panel assessment.  But, in order to receive the medication, the Panel process must be completed. Pevia II, ECF 10-2, ¶ 18.  The Wexford infectious disease consultant does not deny an inmate HCV therapy; rather the inmate's case is reviewed by the HCV Panel.  *Id*.

Plaintiff claims that the policy is inappropriate as it was based on the financial needs of the institution, which he claims is an improper factor for determining medical treatment.  Pevia I, ECF 23 at 10.  In his view, references to financial considerations were taken out of the HCV

policy manual after he filed this case.  *Id*.; Pevia II, ECF 11 at 3.

2.    Plaintiff's Treatment

Plaintiff has a medical history significant for HCV, hypertension, shoulder pain and dislocation.  Pevia I, ECF 18-6, ¶ 4; *see also* ECF 18-7 (plaintiff's relevant medical records). Plaintiff was evaluated by Dr. Ashraf on January 20, 2016, at the CCC for evaluation of his HCV status.  *Id*., ECF 18-7, at 1-2.  The evaluation was negative for abdominal distension, abdominal pain, blood in his stool, bruising, fever, jaundice, lethargy, melena (dark sticky feces), nausea, pruritus, sleep pattern changes, sweats/chills, tremors, vomiting, weight gain or loss.  *Id*. Plaintiff's medical records further reflect that while plaintiff had begun antiviral treatment, he discontinued same after the third injection.  *Id*.  Plaintiff's examination was unremarkable and he was scheduled to return to the HCV CCC in three months. *Id*. at. 2.

On April 11, 2016, plaintiff was evaluated by Dr. Ashraf in the CCC for regular evaluation of his HCV status.  *Id*. at 6-8.  It was again noted that plaintiff had signed off on antiviral therapy after his third treatment.  *Id*. at 6.  He was educated on the risks of signing off on treatment. *Id*.  He denied any fatigue or tiredness and the examination was  negative for abdominal distension, abdominal pain, blood in stool,[6] bruising, fever, jaundice, lethargy,

---

[6] Plaintiff disputes this notation.  He states that he has evidence that he submitted a sick call slip and was seen by Dr. Ashraf on this date due to blood in his stool.  Pevia I, ECF 24 at 3, 5;  *id*., ECF 24-2 at 1. The documents provided by plaintiff demonstrate that as a result of his complaints, plaintiff was seen by Amy Booth, R.N. (not Ashraf as he  alleges), and provided stool cards and Colace due to his complaints of  bleeding due to dry stool.  *Id*., ECF 24-2 at 2-3; Pevia II, ECF 11 at 6-7.  Plaintiff generally alleges that no matter what an inmate says during a CCC visit, it is noted as "no complaint."  Pevia I,  ECF 24 at 6.

Plaintiff also alleges that his medical records have been falsified in that he did exhibit signs and symptoms of chronic HCV infection.  Pevia II, ECF 11.  He provided an Affidavit from his cellmate, Shawn Johnson, who claims that on May 12, 2016, he overheard Monica, described as a "medication medical personal," respond to plaintiff's inquiry regarding his lack of

melena, nausea, pruritus, sleep pattern changes, sweats/chills, tremors, vomiting, or changes in weight. *Id*. Plaintiff was scheduled to return to the clinic in three months. *Id*. at 8.

Plaintiff requested approval of Harvoni treatment. Pevia I, ECF 18-7 at 9. His biopsy showed G2 S2 fibrosis, which Dr. Baucom and Dr. Barrera describe as a mild disease level. Pevia II, ECF 10-3, ¶ 8 (Baucom Declaration, stating that on June 16, 2016, "[t]he Plaintiff presented with a biopsy proven G2 S2 fibrosis which is considered a mild disease level. . . ."); Pevia I, ECF 18-6, ¶ 9 (Barrera Affidavit, describing plaintiff's biopsy as placing him at G2 S2).

Because plaintiff presented with a G 2S2 level, he was considered for reevaluation in June 2016. ECF 18-6, ¶ 11. On June 16, 2016, Pevia was seen at a Telemed conference by Dr. Wolde-Rufael, head of the statewide DPSCS Panel and an infectious disease specialist at the UMMS. Pevia I, ECF 17-6, ¶ 7. At the conference, plaintiff's medical records were reviewed.

The review of plaintiff's records indicated that plaintiff was diagnosed with HCV in 2010, prior to his incarceration. Pevia I, ECF 18-7 at 9. A confirmatory test was completed on January 31, 2012. *Id*. Plaintiff was genotyped 1A on April 19, 2012, and he had a viral load of 234,786 on October 19, 2012. Plaintiff's liver biopsy, conducted on December 13, 2012, placed him at Grade 2, Stage 2.[7] As noted, Grade 2 is deemed "mild" and Stage 2 means "mild scarring." Further, plaintiff began Pegylated/Ribavirin therapy, but it was discontinued after

---

treatment as "cause that shit cost too much." Pevia II, ECF 11 at 1; Pevia I, ECF 23-1 at 15. Johnson also claims to have observed, on unspecified days, the side effects of plaintiff's HCV, including that plaintiff was too weak to do his daily everyday activities. He states that plaintiff would lay in his bunk complaining of his rib area, had no appetite, and that on some days plaintiff's urine had a strong odor. *Id*.

[7] The notes from the Telemed conference held on June 22, 2016, and June 27, 2016, note the grade and stage of plaintiff's liver as G2 S3 in the first paragraph, referring to reason for visit. ECF 18-7 at 10-11. The notes from June 22, 2016, refer to plaintiff's grade and stage as G2 S2 in the second paragraph. The reference to G2 S3 appears to be an error as the grade and stage is not referred to in that manner in any other documents.

three weeks, due to side effects.  Pevia I, ECF 18-7 at 9.  There was no known alcohol or illicit drug use by plaintiff in the preceding year. Additionally, it was noted that he had completed the Twinrix[8] series and tested negative for HIV on September 10, 2012.  *Id.*

Plaintiff was again seen by Dr. Wolde-Rufael via  Telemed conference on June 22, 2016, in order to prescreen plaintiff as a candidate for Harvoni treatment.  *Id.* at 10.  Plaintiff was advised of the new HCV treatment guidelines and the prioritization of HCV treatment.  He was counselled on the outcome, duration, and potential side effects of treatment with Harvoni.  He was directed to avoid alcohol, intravenous drug use, substance abuse, as well as tattoos.  *Id*.

On June 27, 2016, plaintiff was again seen by Dr. Wolde-Rufael via a Telemed conference.  Notably, plaintiff was advised that the Panel had approved him for Harvoni treatment.  *Id*. at 11.  Instructions were given to obtain a baseline viral load before beginning treatment. *Id*.

Plaintiff was seen by Krista Bilak, R.N.P., on July 2, 2016, at the CCC for regular evaluation of his HCV status.  Pevia I, ECF 18-7 at 12-14.  Plaintiff's physical examination was unremarkable.  *Id*.  It was noted that he had no symptoms of abdominal distension, abdominal pain, blood in stool, bruising, fever, jaundice, lethargy, melena, nausea, pruritus, sleep pattern changes, sweats/chills, tremors, vomiting, or change in weight.  *Id*.  However, Pevia reported a knee injury (*id*. at 13), and management of both his hypertension and HCV were addressed.  *Id.* Pevia was scheduled to return to the CCC in three months.  *Id*.

Plaintiff's chart was updated on July 6, 2016, to reflect that he was approved for Harvoni treatment. Pevia I, ECF 18-7 at 15.  That same date, the pharmacist cleared plaintiff regarding any drug interactions and approved Harvoni.  *Id*. at 16-17.  Plaintiff's chart was again updated on

---

[8] Twinrix is described by Dr. Barrera as the vaccination series for Hepatitis A and B. Pevia I, ECF 18-6, ¶ 13.

August 3, 2016, to reflect that he had completed four of the twelve weeks of Harvoni treatment, without significant side effects. *Id.* at 18.

Nurse Bilak saw plaintiff in the CCC on October 6, 2016, as to his HCV status. Pevia I, ECF 18-7 at 19-21. Plaintiff's examination was again unremarkable. *Id*. at 19. Plaintiff denied side effects from Harvoni and indicated his compliance with the medication. He was scheduled to return to the CCC in three months. *Id*. at 21.

Dr. Ashraf evaluated plaintiff at the CCC on February 16, 2017, in regard to his HCV status. Pevia I, ECF 18-7 at 22-24. At that time, plaintiff had completed his Harvoni treatment and was in stable condition for HCV. *Id*. Examination was again unremarkable. *Id*. He was scheduled to return to the clinic in three months. He continues to be monitored regularly by medical personnel in the chronic care clinic for his HCV status. Pevia I, ECF 18-6, ¶ 15. He has access to more immediate care through the use of the sick call process. *Id*.

Plaintiff claims that when his blood work was done it showed that his "levels had risen from when he stopped the Interpheron in 2013, which shows that [he] went unnecessarily untreated for 3 year until he filed his injunction." Pevia I, ECF 23 at 11. Further, he claims that he suffered unnecessarily when he "went sick for days when he would start feeling symptoms of the HCV." *Id*. He also claims that he placed his cellmate at risk for contracting HCV. *Id*.

Drs. Barrera and Baucom each aver that, in their respective opinions, and to a reasonable degree of medical probability, plaintiff "suffered no significant harm" from the decision to implement Harvoni treatment after utilizing Pegylated Interferon and prioritizing the treatment of stage 3 and stage 4 patients. Pevia I, ECF 18-6, ¶ 11; Pevia II, ECF 10-3, ¶ 8. Drs. Barrera and Baucom further state that, to a reasonable degree of medical probability, plaintiff received appropriate treatment for his HCV infection. Pevia I, ECF 18-6, ¶ 15; Pevia II, ECF 10-3, ¶ 9.

### D.    Administrative Process

Plaintiff filed ARP NBCI 1029-16 on May 7, 2016, complaining that Dr. Ashraf and Wexford were deliberately indifferent to his medical care because he had not been treated with Harvoni.  Pevia II, ECF 10-4 at 8-9.  The ARP was investigated and on June 5, 2016, Assistant Warden Nines, acting as the Warden's designee responded as follows, *id.* at 8:

> Our review of your administrative remedy has been completed and your case has been dismissed in accordance with DCD 185-001.  Specifically, you claim that you are not receiving proper Hepatitis C treatment.  An investigation revealed that per the DPSCS clinical services manual, the DPSCS infectious disease clinician in conjunction with the DPSCS HCV panel may choose to prioritize treatment based on available resources. As your biopsy results indicate that you have grade 2 stage 2 liver disease, you are not prioritized as a candidate for Harvoni treatment at this time.  Furthermore, it is noted that you were started on Hepatitis treatment in January of 2013 and signed off of treatment after 3 treatments related to side effects of medication.  You continue to be monitored though the sick call process and through chronic care.  Your administrative remedy allegations are without merit.

Assistant Warden Nines and Dayena Corcoran, Commissioner of the Division of Correction for DPSCS, aver that medical services for inmates at NBCI are provided by private medical contractors. Pevia II, ECF 10-5 (Nines Declaration), ¶ 2 and ECF 10-6 (Corcoran Declaration), ¶ 2.  They aver that they had no personal involvement in the provision of medical care to any inmate.  *Id.*   Indeed, they claim that they have no authority to make decisions regarding any inmate's medical care, nor the authority to order or recommend the contractor's medical staff to perform any particular medical procedure or to render any particular treatment.  *Id.*   Nines and Corcoran confirm that neither is licensed to practice medicine and that they generally defer to the expertise of the medical staff regarding the medical care and treatment of inmates.   *Id.*   Corcoran advises that she has no responsibility under the medical company's contract to monitor the provision of medical services to inmates.  Pevia II, ECF 10-6, ¶ 2.

An inmate may fill out a sick call slip to seek medical care.  Pevia II, ECF 10-5, ¶ 2.  The

sick call is collected and reviewed by the private medical contractor who is responsible for scheduling appointment dates and times. *Id.* When reviewing an inmate's complaint about medical care, Nines and his staff rely on the reports, assessment, and judgment of the trained medical staff. *Id.* Nines avers that he did not interfere with, hinder, or delay medical treatment or care to plaintiff. *Id.*

When reviewing an inmate's complaint about medical care, Corcoran avers that she, too, relies on the reports, assessments, and judgment of trained medical staff to prepare any response to the complaint. Pevia II, ECF10-6, ¶ 2. She relies upon medical staff's expertise as well as expertise of the Medical Director for DPSCS for the reasonableness of treatment as well as for compliance with policies and directives. *Id.*

## II. Standard of Review

Defendants' motions are styled as motions to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed App'x. 220, 222 (4th Cir. 2016) (per curiam). But, when the movant expressly captions its motion "in the alternative" as one for summary

judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its

opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id*. (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court

'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

Plaintiff has not sought discovery. The defendants and plaintiff have submitted numerous exhibits. I am satisfied that it is appropriate to address defendants' motions as ones for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens*

*Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC,* 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.

And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. In *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017), the Court said: "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III. Discussion

### A.    Personal Participation

The Complaint does not allege any personal participation by defendants Robustianno Barrera, M.D. or Mahboob Ashraf, M.D. in regard to the alleged denial of adequate medical care. Liability under §1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). Other than being named in the caption of the complaint, defendants Barrera and Ashraf are not mentioned anywhere in the factual allegations of the complaint. Plaintiff does not attribute any action or inaction to Barrera or Ashraf that resulted in his being denied constitutionally adequate medical care. Simply stated, plaintiff's allegations fail to state a claim against defendants Barrera or

Ashraf for an Eighth Amendment violation based on deliberate indifference to a serious medical need.

**B.      Supervisory Liability**

Plaintiff clarified in his opposition (Pevia II, ECF 11) that Baucom is responsible for his care and the development of the HCV treatment policy as the Director of Medical Services for DPSCS. Pevia II, ECF 11 at 2. Further, he clarifies that Nines and Corcoran are responsible for his care as the acting Warden of NBCI and the Commissioner of Correction. *Id*. at 3-4.

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978); *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Under § 1983, individual liability must be based on personal conduct. *See Wright v. Collins,* 766 F.2d 841, 850 (4th Cir. 1985); *see also Foote v. Spiegal,* 118 F.3d 1416, 1423 (10th Cir. 1997). Further, absent subjective knowledge, a prison official is not liable. *Farmer v. Brennan,* 511 U.S. 825, 847 (1994); *see Johnson v. Quinones,* 145 F.3d 164, 168 (4th Cir. 1998). Likewise, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. Appx. 279, 282 (4th Cir. 2009).

Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir.

2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  To state a claim of supervisory liability under § 1983, the plaintiff must allege: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

There are no allegations raised against the supervisory defendants that would indicate they are liable as supervisory officials for the actions alleged.  As such, plaintiff's claims against the Correctional Defendants and Wexford are subject to dismissal.

## C.    Medical Care

Defendants assert there are no facts to indicate a claim for violation of Pevia's civil rights under 42 U.S.C. §1983, and they are entitled to summary judgment as a matter of law.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendant or the failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Recently, the Fourth Circuit observed that "not all Eighth Amendment violations are the same: some constitute 'deliberate indifference,' while others constitute 'excessive force.'" *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986)). In general, the deliberate indifference standard applies to cases alleging failure to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, and failure to render medical assistance. *See Farmer*, 511 U.S. at 834; *Wilson*, 501 U.S. at 303; *Thompson*, 878 F.3d at 97. The deliberate indifference standard consists of a two-pronged test: "(1) the prisoner must be exposed to 'a substantial risk of serious harm,' and (2) the prison official must know of and disregard that substantial risk to the inmate's health or safety." *Thompson*, 878 F.3d at 97-98 (quoting *Farmer*, 511 U.S. at 834, 837-38). Conversely, in excessive force cases, "courts must determine 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Thompson*, 878 F.3d at 98 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *King*, 825 F.3d at 219. A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228. And, in a case involving a claim of

deliberate indifference to a serious medical need, the inmate must show a "significant injury."

*Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Proof of an objectively serious medical condition does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225. Put another way, "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178.

The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001). As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute

medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999), is apt here: "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).

Moreover, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105. In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842). Similarly, a prison official"s "[f]ailure to respond to an inmate's known medical

needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

However, even if the requisite subjective knowledge is established, an official may still avoid liability if he "responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844; *see Scinto*, 841 F.3d at 226. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Of import here, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). Thus, inmates do not have a constitutional right to the treatment of their choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2nd Cir. 1986). And, disagreements between an inmate and medical staff as to the need for or the appropriate extent of medical treatment do not give rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)); *see also Fleming v. LeFevere*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference". *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (Actions inconsistent with an effort to hide a

serious medical condition, refutes presence of doctor's subjective knowledge).

It is undisputed that Pevia suffers from HCV. But, defendants assert that at all relevant times his condition has been carefully monitored and treated under existing protocol with approved drugs. The DPSCS policy regarding HCV infection control requires that all inmates testing positive for HCV be enrolled in the CCC so they can be monitored and educated regarding their condition. For inmates diagnosed with HCV, Individual treatments are considered by the Panel. As indicated, the Panel consists of health and mental health providers, pharmacists, and infectious disease specialists. Defendants assert that at all times relevant to plaintiff's Complaint, the primary HCV treatment approved for system-wide care was Pegylated Interferon/Ribavirin. Approval or denial of new medications and treatments for HCV rests with the DPSCS Panel. Once a new medication or treatment is approved, the Maryland legislature must then provide the funding and resources to DPSCS to implement the approved treatment.

To be sure, HCV constitutes a serious medical need sufficient to satisfy the objective component of an Eighth Amendment analysis. But, it is clear that plaintiff's condition has been carefully monitored. He underwent various assessments and was seen regularly in CCC. Pevia acknowledges that he was treated with Pegylated/Ribavirin, but that he had to stop it due to the development of side effects. Since filing this Complaint, he has received the full treatment of Harvoni.

Pevia claims that after cessation of the initial viral treatment, and during an unspecified time, he suffered blood in his stool, fatigue, appetite loss, and pain. He contends that medical professionals found a better and more effective treatment for HCV, and he questions why he was not prescribed Harvoni until after he filed for injunctive relief in this case. However, there is no evidence that Pevia's condition worsened due to any delay.

Plaintiff takes the position that as soon as Harvoni became available he was entitled to receive it. In essence, plaintiff's claim has changed from one of alleged denial of medical care to a delay in the care sought. Under either theory, however, the claim fails in light of the ample and uncontroverted medical evidence that has been produced, reflecting that plaintiff's care was constitutionally adequate.

A delay in medical treatment may constitute deliberate indifference. *Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009) (citing *Estelle*, 429 U.S. at 104-05). But, the plaintiff must show that the delay in providing medical care caused him to suffer substantial harm. *See Webb v. Hamidullah*, 281 Fed. Appx. 159, 166, 2008 WL 2337608 * 6 (4th Cir. 2008). Substantial harm can be shown by "lifelong handicap; permanent loss, or considerable pain." *Shabazz v. Prison Health Servs. Inc.*, 2011 WL 3489661, at * 6 (E.D. Va. 2011) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001); *see also Coppage v. Mann*, 906 F. Supp. 1025, 1037 (E.D. Va. 1995). To the extent Pevia experienced contradictory statements regarding when or whether he would start on a newer, more effective drug, his condition was nevertheless monitored, as required by existing protocols.

Moreover, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring,* 551 F.2d at 47-48. The record evidence indicates that Pevia was provided treatment for HCV but it was discontinued by him due to the development of negative side effects. He remained with little to no symptoms associated with his HCV condition, and was continually evaluated in the CCC. The fact that Pevia's request to receive Harvoni treatment was initially denied simply does not reflect deliberate indifference on the part of any of the named defendants.

What I said in *Insley v. Graham*, ELH-16-1220, 2016 WL 7157419 * 13 (D. Md. Dec. 8, 2016), as to HCV treatment, is equally apt here:

> In addition to providing constitutionally adequate medical care, prison officials and medical care providers contracted with the State are charged with the responsible distribution of resources. Where, as here, medically trained professionals have assessed the prisoner's medical condition and determined that costly resources, such as Harvoni, are not urgently required, but are in fact required by those who are more ill, deliberate indifference is not the cause for the delay in treatment. Rather, the delay in treatment is occasioned by a careful consideration of how best to treat the prison population without expending public funds irresponsibly. The delay involved in plaintiff's case did not inflict needless pain and suffering, nor has it resulted in a permanent injury to plaintiff.

The disputes of fact asserted by Pevia are not material. Drs. Barrera and Baucom deny that Pevia was harmed over the period of time he alleges new and improved drugs were developed but were not made available to him. The symptoms plaintiff describes do not constitute harm that is actionable. And, the named defendants were never in a position to expedite the bureaucratic process of approval, nor did they ignore any serious symptoms of illness, as alleged. There is no evidence presented, nor does Pevia forecast presentation of admissible evidence, proving that the delay in his receipt of Harvoni caused him harm or needless suffering, or that any of the named defendants played a role in creating that delay. As such, defendants are entitled to summary judgment in their favor as to all claims.

### IV.  Conclusion

The record evidence, which is for the most part undisputed, establishes that plaintiff's constitutional right to adequate medical care for a serious medical need was not violated by the delay in providing him with Harvoni, an alternative antiviral treatment for HCV. Defendants did not exhibit a deliberate indifference to a serious medical need. Therefore, defendants are entitled to summary judgment.

A separate Order follows.


<u>February 20, 2018</u>                                 _____/s/_____
Date                                                                  Ellen L. Hollander
                                                                          United States District Judge